CRAIN, Judge.
This is an appeal from a judgment of the trial court which sustained a motion for a directed verdict made by defendant, Rebsa-men and Associates (Rebsamen) and dismissed the suit of plaintiff, Brunson Bonding (Brunson). The suit was based on a claim for breach of contract concerning a joint venture between the parties to provide an insurance program for Louisiana Power and Light Company. (LP&L).
FACTS
In February 1975, James Brunson, Chairman of Brunson Bonding, contacted LP&L to try to interest it in an owner supplied insurance program to provide worker’s compensation and general liability coverage for the contractors building LP&L’s Waterford Three Nuclear Power Plant at Taft, Louisiana.[1] LP&L was interested, but requested several proposals from other parties in addition to Brunson. LP&L felt Brunson alone did not have enough experience with this type of program to be given the contract, but eventually decided that if Brunson agreed to a joint venture with Rebsamen, an Arkansas insurance broker with whom LP&L was familiar, the two would be awarded the contract.
On September 4th, 1975, Brunson and Rebsamen met and executed a written agreement in regards to the insurance program and were awarded the contract by LP&L. The agreement the parties signed is the object of this dispute. It is exceptionally brief and contains the following stipulations:
1. All publications concerning this insurance program shall bear the names of Brunson Bonding and Insurance Agency, *437 Inc., and Rebsamen & Associates as Co-Brokers.
2. All insurance policies written through the Co-Brokers will be signed by Brunson Bonding and Insurance Agency, Inc.
3. Rebsamen & Associates will be the broker insofar as Louisiana Power & Light Company is concerned with respect to Agent of Record Letters, Marketing, Administration and Servicing of this insurance program.
4. The services of Brunson Bonding and Insurance Agency Inc. will be available and utilized whenever and wherever possible.
5. Charges for the services of ... shall be deducted ... All commissions then remaining shall be shared on a seventy-five/twenty-five percent (7⅝5%) basis with Rebsamen & Associates retaining seventy-five (75%) of said remaining commissions and paying Brunson Bonding and Insurance Agency, Inc. twenty-five percent (25%) of said remaining commissions. The commissions shall be payable monthly with an adjustment following the annual audit by the insurance companies involved.
6. This agreement shall remain in effect for the construction of Waterford Three.
Two years later on September 7th, 1977, James Brunson wrote a letter to Charles Harper, president of Rebsamen, expressing Brunson’s dissatisfaction with Rebsamen. In this letter, Brunson reviewed the first five stipulations in the agreement and wrote that Rebsamen had failed to carry out all of the written provisions as well as all of the numerous verbal agreements he alleged the parties had made. He concluded this letter with the following: “You have failed to comply with all items of our verbal contract and all items of our written contract. Therefore, I am advising you this date of my disassociation with Rebsa-men and Associates in the joint venture.” Thereafter, Rebsamen ceased paying commissions to Brunson.
Nothing more transpired between the parties until nearly four years later when in February of 1982 Brunson filed a petition against Rebsamen styled “Suit for Accounting on Contract”. The allegations contained therein were that Rebsamen committed numerous breaches of the agreement. Brunson demanded an accounting for all sums due through the full term of the contract. The evidence at trial showed that approximately $20,000,000 worth of insurance premiums were paid at the Waterford Three project from the start of construction to the date of trial. Brunson claimed its 25% share of these commissions was $313,530.90.
The only witness plaintiff called was Mr. Brunson. At the conclusion of his testimony, the defendant moved for an involuntary dismissal which the trial court granted. The trial court found that Rebsamen had not breached the agreement in any particulars. Instead the court found that Brunson had breached the agreement by disassociating itself from the joint venture.
Brunson has appealed alleging three assignments of error:
I. The trial court committed error in refusing to permit oral testimony concerning the verbal agreements between the parties and the classification of the written agreement.
II. The trial court committed error in failing to find a breach of contract on the part of “Rebsamen”.
III. The trial court committed error in granting a directed verdict in favor of “Rebsamen”.
In a non-jury case the standard for the trial court’s determination of a motion for directed verdict is whether plaintiff submitted sufficient evidence to establish his claim by a preponderance of the evidence. Our standard of review of a directed verdict in a non-jury case requires that the trial judge not be manifestly erroneous. Egle v. Kidd, 442 So.2d 669 (La.App.1st Cir.1983). Because we find no manifest error in the trial court’s ruling that Brun-son breached the contract, we need not address the first two assignments of error.
*438 THE “DISASSOCIATION”
Even if Rebsamen did breach certain obligations under the agreement, the legal effect of Brunson’s letter of September 7, 1977, must be considered. This letter outlined Rebsamen’s alleged failure to comply with the agreement and concluded that Brunson was “disassociating]” itself from the joint venture. The trial court found, and Rebsamen contends that this “disassociation”, was, in fact, the only breach that occurred. Brunson argues that this letter put Rebsamen in default, that Brunson remained available to perform services and that the letter was not a breach on its part. Brunson alternatively argues that if the letter was a breach on Brunson’s part, then Rebsamen has never placed Brunson in default. In order to determine whether or not Brunson’s letter placed Rebsamen in default, it must be determined if the breaches Rebsamen allegedly committed were active or passive under former La. C.C. art. 1931.[2] If the breaches were active, there was no need for a putting in default under former La.C.C. art. 1932.[3] If the breaches were passive, a putting in default was necessary for damages to be due per former La.C.C. art. 1933.[4] Under former La.C.C. art. 1931 a breach was active by “... doing something inconsistent with the obligations ...” or a breach was passive by “... not doing what was covenanted to be done ... ”.
All of the alleged breaches by Rebsamen constituted a failure to do something covenanted to be done. These alleged breaches of both the written and oral contract are: failure to include Brunson’s address and telephone number on all publications; failure to list Brunson’s name first on such publications; failure to send policies to Brunson for signature and delivery; failure to utilize Brunson’s services; failure to make timely monthly accountings and give annual adjustments. We find that if these breaches occurred, they were passive. Rebsamen would not have done or performed as it had covenanted. When it did perform its acts were not inconsistent with the agreement. We emphasize at this point that Brunson was being paid its share of commissions until it sent the letter in question. We do not find that Rebsamen’s alleged actions constitute active violations, inconsistent with the agreement. Consequently, it was necessary for Rebsamen to be placed in default.
Under former La. C.C. art. 1911 there were three valid methods of placing a party in default. Only section 2 is pertinent here. It provides for placing in default, “By the act of the party, when at or after the time stipulated for performance, he demands that it shall be carried into effect, which demand may be made ... by a demand in writing ...”.
Although the letter Brunson wrote outlines its dissatisfaction with Rebsamen’s failure to perform, nowhere in the letter is there a demand for performance as required by former La. C.C. art. 1911. Therefore, Rebsamen was not placed in legal default. Brunson’s “disassociation” from the contract was held to be a breach by the trial court. We agree. However justified Brunson felt, it did not follow the proper legal requisites in this case.
We find that Brunson’s disassociation from the joint venture was meant to terminate the venture and that Brunson chose to have nothing further to do with it. Brunson’s actions were at that point totally inconsistent with any obligations it had agreed to. Therefore Brunson was in active breach. Brunson chose to end the *439 joint venture, while Rebsamen continued at least partial performance. Rebsamen had paid all commissions due up to the time the letter was sent. Brunson’s actions amounted to a refusal to perform and relieved Rebsamen from any further performance, and obviated the need for Rebsamen to place Brunson in any formal default. See Andrew Dev. Corp. v. West Esplanade Corp., 347 So.2d 210 (La.1977). See also comments to present La. C.C. art. 2016. Brunson cannot seriously contend that after it announced its desire to end the joint venture to Rebsamen that it still stood ready to perform. Rebsamen could only conclude that Brunson desired no further performance from it and that it in turn could expect none from Brunson. Accordingly, the judgment against Brunson is affirmed. Appellant to pay costs.
AFFIRMED.

. In an owner supplied insurance program the owner procures insurance in the types of coverages and amounts from the company it chooses. It requires the contractors working on its job site to have and use this insurance. The contractors do not go out and acquire their own coverage, they merely pay the premiums. Thus, the insurance agents (Rebsamen and Brunson) do not have to sell insurance to them, but merely handle the paper work and deliver the policies. This type of program can be profitable for the owner.

. La. C.C. arts. 1911, 1931, 1932 and 1933 were amended and re-enacted by 1984 La. Acts No. 331, eff. Jan. 1, 1985 and are now contained in La. C.C. arts. 1756 to 2057.

. La. C.C. art. 1932 provided:
When there is an active violation of the contract, damages are due from the moment the act of contravention has been done, and the creditor is under no obligation to put the debtor in default, in order to entitle him to his action.

.La. C.C. art. 1933 provided in pertinent part: When the breach has been passive only, damages are due from the time that the debtor has been put in default, in the manner directed in this chapter....